2023 IL App (1st) 220314-U
No. 1-22-0314

FIRST DIVISION
November 6, 2023

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 08 CR 15903 |
| | ) | |
| MELISSA ALMENDAREZ, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Thaddeus Wilson, |
| | ) | Judge Presiding. |

JUSTICE Pucinski delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1 *Held:* We affirm in part and reverse in part the circuit court's dismissal of defendant's postconviction petition at the second stage of postconviction proceedings. Defendant failed to make a substantial showing that she received ineffective assistance of trial counsel for failing to investigate and call an eyewitness identification expert, but she did make a substantial showing that her trial counsel was ineffective for unilaterally rejecting a plea offer.

¶ 2 On appeal from the second-stage dismissal of defendant's amended petition for postconviction relief, defendant, Melissa Almendarez, argues that the circuit court erred in granting the State's motion to dismiss where her trial counsel was ineffective for: (1) failing to investigate and call an

eyewitness identification expert; and (2) unilaterally rejecting the State's offer to plead guilty. For the following reasons, we affirm in apart, reverse in part, and remand for an evidentiary hearing.

¶ 3                                                    BACKGROUND

¶ 4        On June 7, 2008, Marilu Resendiz, who was 20 weeks pregnant with her third child, was attacked and robbed by four Hispanic women. She delivered a stillborn baby two days after the attack. Defendant, along with Maresa Prado and Patricia Lopez, was subsequently arrested in connection with the attack on Resendiz and was charged with intentional homicide of an unborn child (720 ILCS 5/9-1.2(a)(1), (a)(2) (West 2008)) and robbery (720 ILCS 5/18-1(a) (West 2008)). Defendant and Prado were tried together by a jury before the Honorable Rosemary Higgens-Grant. Lopez elected to proceed by way of a simultaneous and severed bench trial. The jury trial found defendant guilty of intentional homicide of an unborn child and robbery. The trial court subsequently sentenced her to 23 years' imprisonment and 7 years' imprisonment, respectively.

¶ 5        Defendant challenged her convictions and sentences on direct appeal, arguing: (1) the State's identification testimony was insufficient to prove her guilty beyond a reasonable doubt; (2) she was denied her constitutional right to effective assistance of trial counsel; and (3) the trial court erred in considering improper aggravating factors in imposing the sentence. On September 6, 2012, defendant's convictions and sentences were affirmed on appeal by this court in an unpublished order. *People v. Melissa Alemendarez*, 1-10-2743 (2009) (unpublished order pursuant to Illinois Supreme Court Rule 23). In that order, we presented a procedural history of defendant's case as well as a review of the evidence presented at trial, and we rely, in part, upon that presentation here and recount additional evidence as needed.

¶ 6                                                 <u>Trial Testimony</u>

¶ 7                                                <u>Marilu Resendiz</u>

¶ 8       Marilu Resendiz testified that in June of 2007, she had a physical altercation with codefendant Prado. At the time, she knew Prado only by her nickname, Skirts. After that altercation, Resendiz saw Prado driving and walking around the neighborhood with friends, but they did not have any other interaction until June 7, 2008, when Resendiz had another violent encounter with Skirts. On that date, Resendiz was 20 weeks pregnant with her third child and was "physically showing." Before that day, Resendiz had received regular medical attention for her pregnancy and had not experienced any complications. Resendiz visited the library on 27th Street and Pulaski Avenue, carrying her purse and a clear backpack, which contained a laptop and an IPOD. She left the library sometime after 5 p.m. and walked to a nearby candy store located on 30th and Avers Street. As she approached the intersection, she saw a "baby blue" van drive through a stop sign, she "flipped [her] finger" at the van but did not know who was driving the van.

¶ 9       Resendiz was walking along the street listening to music from her IPOD using one headphone. She did not hear anyone nearby, but suddenly felt her hair being pulled. She was punched in the face, causing her to fall to the ground. She continued to be punched, she put her head down and her arms around her stomach. She screamed that she was pregnant, but heard one of them respond, "You're not pregnant *** you're just a fat bitch."

¶ 10       At that point, Resendiz remained hunched over while she was on the ground and did not look at her assailants. She heard multiple voices, but she did not know how many girls were attacking her. The assailants continued to strike Resendiz on her head, belly, and back and demanded that she let go of her backpack. When Resendiz let go of her purse and backpack, she was able to see the faces of three of the four assailants. She did not see the face of the girl who remained behind her.

¶ 11    Resendiz testified that the three girls were standing over her and that their faces were "a couples of inches away." She immediately recognized that one of her attackers was Prado, who she knew as Skirts, from their prior altercation one year earlier. She recognized Prado's face as well as the birthmark on her neck. Resendiz had not seen the other two women prior to this date, but she had the opportunity to see their faces during the attack and made in-court identifications of both defendant and Lopez. The women took Resendiz' purse, backpack and IPOD and left her lying on the ground. Resendiz testified that she did not know specifically, which woman took her property, but stated that her personal items were missing after the attack.

¶ 12    Shortly after the attack, she saw a blue van drive the wrong way on a one-way street. She did not see the women enter the blue van and did not have an opportunity to record the license plate number of the van, but she believed it was the same van that she had seen earlier.

¶ 13    After the attack, Resendiz noticed that she had blood between her legs, and she screamed for help. When she was unable to get assistance from a nearby residence, she was able to put her cell phone back together and call 911 herself. An ambulance and police car arrived.  Before she was transported to the hospital, she spoke to a police officer and immediately identified one of her assailants as Skirts. She was not asked to provide additional descriptions of the other offenders.

¶ 14    She arrived at the hospital with a bump and scratches to her face, bruises on her legs, and a red mark on her stomach.  She was treated, provided pain killers, and released from the hospital the next day. She returned to the hospital that same day because she had stomach pain, vaginal bleeding with blood clots, and a frequent urge to urinate. She was treated and then transported to another hospital via ambulance. Upon arrival, she learned that her amniotic sac had ruptured and that her baby was not going to survive. Resendiz delivered a stillborn baby girl, who she named Deliah Cabral, on June 9, 2007. While she was still hospitalized, Resendiz spoke to Chicago Police

Detectives Gallagher and Kelly, and informed them about Skirts' involvement in the attack. At that point, she did not know Skirts' real name.

¶ 15      After Resendiz was released from the hospital, she spoke to her sister-in-law, Yesenia Mendez. During that conversation, Resendiz learned additional information about Skirts. She immediately called Chicago Police Detective Daniel Gallagher and informed him that Skirts' real name was Maresa Prado. On June 11, 2008, Detective Gallagher and Detective Michael Kelly showed Resendiz a photo array, and she identified Prado as one of the females involved in the attack.  On June 27, 2008, at Area Four Police District, Resendiz identified Prado in a five-person lineup. At that time, she did not have any information about the identities of the other attackers.

¶ 16      On July 19, 2008, Resendiz received a telephone call from a man named Daniel. After that conversation, she called her sister-in-law Yesenia Mendez and together they went to meet with a woman named Shaunte. Shaunte took them to a house in the neighborhood, and Resendiz immediately contacted Detective Michael Kelly.  The next day, Resendiz identified defendant in a photo array as one of her attackers. On July 22, 2008, she viewed a physical lineup and identified defendant as one of her attackers. That same day, Detective Kelly showed Resendiz a third photo array, and she identified Lopez as one of the attackers. The following day, she identified Lopez in a physical lineup.

¶ 17      At trial, Resendiz testified that each of the codefendants appeared similarly to the way that they looked on the day of the attack, although defendant's hair was different. Specifically, Resendiz explained that defendant had "streaks of blond hair" on June 7, 2008, whereas, she no longer had blond highlights in her hair on the date of trial.

¶ 18      On cross-examination, Resendiz testified that she had not seen Prado driving a blue van and, prior to the attack, had not seen Prado in the company of defendant or Lopez. She explained that,

during the attack, she was huddled on the ground and only had a few seconds to view the faces of her attackers. She admitted that she did not know defendant at the time of the attack, but after speaking to people, she was able to make a positive identification. Although a police report indicated that Resendiz had described one of her attackers as a Hispanic female with long blonde hair, Resendiz clarified that she meant to describe defendant as having blonde highlights, not blonde hair.

¶ 19                                    Chicago Police Officer Michael Alesia

¶ 20        Officer Michael Alesia testified that he and his partner, Officer Jorge Santos, were dispatched to 3930 West 28th Street to investigate a robbery. Upon their arrival, Officer Alesia saw an ambulance was already at the scene and paramedics were treating the victim, Marilu Resendiz. Officer Alesia approached Resendiz as she was in the ambulance. He observed bruises and marks "all over" her face, and her abdomen was "swollen" and "extended." He testified that, in his opinion, her abdomen was consistent with a pregnancy. Resendiz was "hysterical" and "very visibly distressed, both physically and emotionally," but she provided him with an account of the attack and the persons involved. Specifically, Resendiz told him that four female Hispanics had attacked her, and she identified one of her assailant as Skirts, a girl that she knew who was associated with the area of 28th Street and Tripp. Resendiz kept repeating the name Skirts and told the officer that the four women had jumped into a blue van after the attack.

¶ 21        Officer Alesia and his partner "toured the area" in search of a blue van, but they were unable to find a vehicle matching the description provided by Resendiz. The officer then went to the hospital to speak with Resendiz and her treating physician. Officer Alesia wrote his report of the incident and passed the information to Chicago Police Detective Catherine Rolewicz.

¶ 22    On cross-examination, Officer Alesia acknowledged that in his report, he included a brief, general description of the suspect, that Resendiz identified as Skirts, as a female Hispanic in her late teens. He further acknowledged that he did not include physical descriptions of the other three assailants in the report, and explained that the omission was because Resendiz did not provide him with any physical descriptions of those people. In addition, Officer Alesia confirmed that Resendiz never provided him with defendant's name or specifically identified her as one of her assailants.

¶ 23                    Chicago Police Detective Catherine Rolewicz

¶ 24    Detective Catherine Rolewicz, assigned to the property crimes division, testified that she was assigned to investigate the robbery and attack of Resendiz. On June 7, 2008, at approximately 7:00 p.m., she went to the hospital to check on Resendiz's condition. Upon her arrival at the hospital, she conversed with Officers Alesia and Santos before speaking to Resendiz. Resendiz was lying in a hospital bed and had a bump and bruises on her face as well as scratches on her arms and knees. Detective Rolewicz also saw that Resendiz's stomach area was "large" and "protruding" and that she appeared to be pregnant. Although Resendiz was upset and "visibly shaken," she was able to converse with Detective Rolewicz and recount her recent attack.

¶ 25    Resendiz immediately identified Skirts as one of the four assailants, and described her as a Hispanic female, approximately 18 to 22 years old, 5' 6" tall, and weighed about 140 pounds. Resendiz was unable to name the other three offenders, but she did provide the detective with physical descriptions for two of the other assailants. Resendiz described the second offender as a shorter Hispanic female with long curly dark hair, 5' 2' tall, and weighed between 150 to 170 pounds, and the same age range as Skirts. Resendiz described the third offender as a Hispanic female with long blonde hair. She was unable to provide any physical description of the fourth female assailant. Detective Rolewicz did not press her for any additional information at that time

but provided Resendiz with her business card if she had any additional information. The detective learned from the treating physician that Resendiz had lost her baby. At this point, this investigation was reassigned to Chicago Police Detective Michael Kelly, a homicide detective.

¶ 26    On cross-examination, Detective Rolewicz acknowledged that Resendiz never named defendant as one of the assailants during this interview. She subsequently reviewed the arrest report for Maressa Prado. The report revealed that Prado resided at 2840 South Tripp Avenue and was known by the nickname of Skirts. Detective Rolewicz acknowledged that the arrest report described Prado as measuring 5' 4" tall, which was different from the 5' 6" description of Skirts that was initially provided by Resendiz.

¶ 27                    Chicago Police Sergeant Michael Kelly

¶ 28    Sergeant Michael Kelly testified that, when he was a homicide detective, he was assigned to investigate the attack of Resendiz. He first met with Resendiz at the hospital on June 11, 2008. At that time, she was "obviously distraught" and had facial bruising. After speaking with her, Sergeant Kelly compiled a photo array. Later that evening, she showed the photo array to Resendiz after she had been released from the hospital, and after she signed the lineup advisory form. Resendiz identified Prado as the person she knew as Skirts and "one of the people that had punched her in the face and stomach and took her property."

¶ 29    After Resendiz made the identification, Sergeant Kelly and his partner, Detective Daniel Gallagher, located and arrested Prado on June 27, 2008. When Prado was in custody, she asked to make a phone call to her boyfriend, Renee. Prado provided Sergeant Kelly with the phone number, and he dialed the phone for and remained with her throughout the call. He heard Prado tell her boyfriend that she had been arrested "for that Marilu thing."

¶ 30    On July 20, 2008, Sergeant Kelly met with Resendiz and showed her a second photo array. After signing an advisory form, Resendiz identified defendant as another attacker. Defendant was arrested the next day and, during a physical lineup, Resendiz identified defendant as one of the attackers.

¶ 31    On July 22, 2008, Sergeant Kelly learned that a person named "Patty" might have also been involved in the attack on Resendiz. He went to speak with Fred Feliciano, the owner of a gas station located at 28th and Pulaski. After conversing with Feliciano, Sergeant Kelly returned briefly to the police station before he returned to the gas station to show Feliciano a photo of Patty Lopez. Sergeant Kelly returned to the police station, where he complied a third photo array, which he showed to Resendiz. Resendiz identified Lopez from the photo array. Lopez was arrested the next day, and her height was listed as 5'2" tall and her weight was 160 pounds.

¶ 32                    Chicago Police Sergeant Daniel Gallagher

¶ 33    Sergeant Gallagher testified that, when he was a homicide detective, he and his partner, Detective Michael Kelly, were assigned to this case. On the evening of June 27, 2008, he met with Resendiz at Area Four Police District and had her view a lineup after she signed a lineup advisory form. Resendiz positively identified Prado as one of the people who beat and robbed her. Resendiz made the identification within "[s]econds" of viewing the lineup.

¶ 34                            Shaunte Ramirez

¶ 35    Shaunte Ramirez testified that she was defendant's third cousin and had known Prado and Lopez for years, including before the attack on Resendiz. Ramirez testified that defendant was friendly with Prado and Lopez and that she had seen the three defendants together on several occasions. Ramirez was also friendly with Resendiz because their children were similar in age and

would play together at the local park. Ramirez was also "best friend[s]" with Resendez's sister-in-law, Yesenia Mendez.

¶ 36 Ramirez testified that in June of 2008, defendant was dating Danny Montez, and she knew that someone in Montez's family owned a blue van. Prior to the attack on Resendiz, she had seen Montez's brother driving the van through the neighborhood. She acknowledged that she had never seen defendant, Prado, or Lopez driving the vehicle. Ramirez heard about the attack on Resendiz the day after it occurred, and she subsequently spoke with Yesenia about it. After Resendiz was released from the hospital, Ramirez spoke with her. Based on their conversation and the descriptions that Resendiz gave of her attackers, Ramirez provided Resendiz the names of defendant and Patty Lopez. She also confirmed that Prado had a mole or mark on her neck. Ramirez never showed Resendiz pictures of defendant or Lopez. On cross-examination, Ramirez acknowledged that she was not close with defendant or defendant's side of the family, but denied that she provided defendant's name to exact revenge on, or cause trouble for, her cousin.

¶ 37                                     Doctor Michelle Jordan

¶ 38 Doctor Michelle Jordan testified that she was an assistant medical examiner and performed the autopsy on Resendiz's female stillborn infant, who had died on June 9, 2008, at 1:52 p.m. Doctor Jordan determined that the infant was approximately 20 weeks of gestational age at the time of death. An external examination of the infant revealed a "distinctive red discoloration," confirmation that the baby died in utero. An internal examination revealed that "[e]verything was normal in regards to every single organ system in the body. There was no evidence of a disease process, there was no evidence of malformation of any of the organs." She concluded that the infant appeared to have been developing normally.

¶ 39    Doctor Jordan also examined the placenta, the "main organ that delivers all of the nutrients as well as blood flow to the fetus." She explained that examination of the placenta is necessary in stillborn births to determine whether the infant's death in utero was caused by a placental abruption, which is a tear that occurs in the placenta that prevents blood flow and nutrients from reaching the developing fetus. She explained that placental abruption is "fairly rare," but that there are certain risk factors that exist that predispose a woman to experience a placental abruption during pregnancy, including: hypertension, cocaine or methamphetamine abuse, prior history of placental abruption, and maternal trauma.

¶ 40    Doctor Jordan confirmed the existence of placental abruption when she discovered a blood clot that indented the placental plate and occupied "approximately 52 percent of the entire surface of the placenta." She explained that "[a]nytime you have placental abruption over 25 percent involvement of the placental plate, it increases the stillborn deaths drastically. Anytime you have a placental abruption that occupies approximately 30 percent of the placental plate, it can cause a woman to go into pre-term labor." Based on her examination of the placenta,

¶ 41    Doctor Jordan then sought to determine the cause of the abruption, and she noted that Resendiz's medical history was devoid of hypertension or drug use and of prior experiences of placental abruptions during her earlier pregnancies. Ultimately, Doctor Jordan determined that the placental abruption that occurred in the instant case was the result of the physical trauma that Resendiz experienced on June 7, 2008. She testified that the assault caused the placental abruption, which ultimately deprived the fetus of oxygen and resulted in "an affixial-type [of] death."

¶ 42                                    Defendant

¶ 43    Defendant testified that in June of 2008, she knew Maresa Prado "her whole life" and had been friendly with Patricia Lopez for approximately four years. She denied knowing Resendiz and

testified that the first time that she saw Resendiz was in court. She acknowledged that Daniel Montez was her boyfriend and that he was the father of her one-year-old son. She denied that Montez or anyone in his family owned a blue van.

¶ 44     Defendant denied that she was involved in the attack on Resendiz, and testified that she was not in the vicinity of 28th and Harding at the time of the attack, was not riding in a blue van, but she could not recall her precise whereabouts. The first time that defendant heard about the attack on Resendiz was when Maresa Prado was arrested. When defendant was arrested on July 21, 2008, she had highlights in her dark brown hair. She denied that she had blonde hair. Defendant acknowledged that Shaunte Ramirez was her cousin, they grew up together, and attended family functions together, but they did not socialize together. Defendant identified several photographs showing her and Ramirez together at family gatherings when they were younger.

¶ 45     On cross-examination, defendant acknowledged that Prado's nickname was Skirts and that she, Prado, and Lopez spent time together in the summer of 2008. Defendant further acknowledged that at the time of her arrest, her hair was long and had "blonde" highlights. Her hair was much lighter that summer than at the time of trial. Although defendant acknowledged that she was familiar with the neighborhood where the attack occurred, had been on the block of Springfield and Harding during the summer of 2008, she denied that she saw Resendiz in that area and that she was present in that area at the time of Resendiz's attack. Defendant admitted that, before trial, she talked to Prado about the case and about her testimony.

¶ 46                                           Maresa Prado

¶ 47     Codefendant Maresa Prado testified that her natural hair color was "dark brown," her hair was that color in June of 2008, but acknowledged she had previously dyed her hair blonde. Prado acknowledged that the photo used by the police in the photo array that was shown to Resendiz

depicted her when she had blonde hair. She also testified that she has a mole on her neck. Prado admitted to the 2007 physical altercation with Resendiz but denied having any additional conversations or interactions with Resendiz. She admitted that her nickname was Skirts. She acknowledged that at the time of the June 2008 attack, she had known defendant for four years and Lopez for two months, and "associated" with them around the neighborhood, including the local park.

¶ 48    Prado denied that she had participated in the June 7, 2008 attack on Resendiz, but could not recall where she was at that time. She speculated that she was probably spending time with her daughter but admitted that she was uncertain what she was doing at that time. She denied that she had been in a blue van. She heard about the attack on Resendiz from people in the neighborhood, and she had discussed the attack with her boyfriend, Renee Salazar. When she called her boyfriend from the police station, she was not acknowledging her involvement, but was simply referring to the attack that she and her boyfriend had previously discussed.

¶ 49    The jury found defendant guilty of intentional homicide of an unborn child and robbery. The trial court sentenced defendant to 23 years' imprisonment for intentional homicide of an unborn child and 7 years' imprisonment for robbery.

¶ 50                                    Direct Appeal

¶ 51    Defendant challenged her convictions and sentences on direct appeal. She argued: (1) the State's identification testimony was insufficient to prove her guilty beyond a reasonable doubt; (2) she was denied her constitutional right to effective assistance of trial counsel; and (3) the trial court erred in considering improper aggravating factors in imposing her sentence. On September 6, 2012, defendant's convictions and sentences were affirmed on appeal by this court in an unpublished order. *People v. Melissa Alemendarez*, 1-10-2743 (2009) (unpublished order pursuant

to Illinois Supreme Court Rule 23). On January 30, 2013, our supreme court denied defendant's petition for leave to appeal. *People v. Alemendarez*, 982 N.E.2d 770 (2013).

¶ 52                                 Postconviction Proceedings

¶ 53        On July 22, 2016, approximately three and a half years after defendant's petition for leave to appeal was denied, she filed a *pro se* postconviction petition before the Honorable Thaddeus Wilson. In his petition, she alleged, in pertinent part: (1) ineffective assistance of appellate counsel for providing "erroneous advice about the statute of limitations and her right to counsel in the postconviction act"; (2) there was newly discovered evidence of her innocence where her trial counsel failed to investigate a list of alibi witnesses she provided to him prior to trial; (3) her trial counsel was ineffective for failing to investigate the list of alibi witnesses provided to him by petitioner; (4) trial counsel was ineffective when he unilaterally rejected a plea offer of 20 years' imprisonment without consulting with defendant; and (5) trial counsel was ineffective when he failed to call an eyewitness identification expert. Specifically relating to the plea offer, defendant alleged:

> "Prior to trial was scheduled, the defendant was told by trial counsel that the
>
> state had made an offer of twenty years at eighty five percent for the offense of
>
> intentional homicide of an unborn child. Counsel informed the defendant that he
>
> had rejected the deal because he would be calling witnesses that would testify to
>
> her presence at her families cookout on the day of the alleged incident."

¶ 54        Defendant attached several affidavits to her petition, including affidavits from family members to support her claim that her trial counsel was ineffective for failing to investigate alibi witnesses. Defendant attached her own affidavit, undated, unsigned and not notarized, in which she averred, in pertinent part:

7. "…Prior to my case being schedule for trial, [trial counsel] informed me and my mother that the states attorney that was handling my case was offering a plea deal in my case.

8. He informed us that the deal was twenty year[s] at eighty five percent for intentional homicide of an unborn child.

9. I told my mother that I was going to plead guilty.

10. After my attorney told me about the plea deal he told me he had turned down the state[']s offer.

11. I told him that I wanted to plead guilty and he told me it was too late and that I didn't need to because he was going to call my witnesses.

12. He failed to call my witness and turned down the deal I was willing to accept."

¶ 55    Defendant also attached the affidavit of her mother, Eva Adamez. She averred that, prior to trial, defendant's trial counsel called her and told her that the state's attorney "had made an offer of twenty years at eight five percent…and he had told the state's attorney "no because he would be calling witnesses to testify to the fact that [defendant] was at a cookout with family and friends." She further averred that she "told him that whatever [defendant] decided I would support her, and that he should ask her what she wanted to do about the plea offer."  According to this affidavit, defense counsel "turned the plea down but [defendant] was willing to take/accept the plea offer."

¶ 56    On October 14, 2016, the Honorable Thaddeus Wilson, without making any determination that defendant's claim satisfied the standard for proceeding to the second stage of postconviction proceedings, docketed defendant's *pro se* postconviction petition and appointed the public defender to represent her. Subsequently, the circuit court appointed private counsel to represent defendant.

¶ 57        During the second stage proceedings, the circuit court granted defendant's motion to hire an eyewitness identification expert. Subsequently, postconviction counsel filed an amended postconviction petition on September 27, 2018. In pertinent part, the amended petition reiterated defendant's claim of ineffective assistance of trial counsel for failing to present expert testimony on eyewitness identification and ineffective assistance of appellate counsel for failing to raise this issue on direct appeal. In support of this argument, she attached the affidavit of Doctor Geoffrey Loftus to the amended petition who averred that he was an expert in the field of eyewitness identification.

¶ 58        In the amended petition, counsel also raised the issue that defendant's trial counsel was ineffective for failing to convey an offer from the State to have defendant plead guilty in exchange for a sentence of 20 years' imprisonment. Counsel also raised the claim that defendant's appellate counsel was ineffective for failing to raise this issue on direct appeal.

¶ 59        The State filed a motion to dismiss in which it initially argued that defendant's *pro se* postconviction petition was untimely where it was not filed within the statutory limitations. Substantively, the State argued that defendant's claim regarding the identification testimony was barred by *res judicata* and, alternatively, that defendant failed to demonstrate how not having an identification expert was "fundamentally unfair" and failed to show that she was prejudiced because she did not establish that the trial court would have allowed such testimony to be admitted. As to the offer of a plea, the State argued that the record does not support defendant's underlying claim that the State made such an offer.

¶ 60        Defendant filed a response to the State's motion to dismiss in which he argued that he was not culpably negligent for the lateness of his filing because he relied upon the faulty advice of appellate counsel. Defendant also argued that the doctrine of *res judicata* did not apply because his appellate

counsel was ineffective for failing to raise the claim of ineffective assistance of trial counsel for failing to present the testimony of an eyewitness identification expert. Defendant further argued that the identification expert would have been allowed when the Illinois Supreme Court had already determined that it was within the trial court's discretion to admit this type of testimony. Regarding the State's argument that defendant did not provide any documentation to support the claim that defendant's trial counsel failed to tender an offer from the State, defendant argued that additional documentation is not available in this type of case because "[t]he State knows offers are rarely made on the record."

¶ 61     On June 6, 2019, the circuit court issued a written order in which it granted a third-stage evidentiary hearing relating to defendant's claim that her trial counsel was ineffective for failing to investigate alibi witnesses. As to the timeliness issue, the circuit court also found that defendant had stated a legally cognizable basis for her late filing, but that the court did not need to resolve this issue at this stage because defendant "was entitled to present evidence on this issue in an evidentiary hearing should her substantive claims merit one." As to defendant's claim relating to the failure to call an eyewitness identification expert, the circuit court determined that this decision amounted to trial strategy and the supreme court acknowledged in *People v. Lerma*, 2016 IL 118496, that the common practice in Illinois was to bar this type of testimony, so counsel could not have reasonably expected such testimony to be admitted. The circuit court also pointed out that courts have found that trial counsels are not incompetent for failing to correctly predict that the law will change. As to the plea offer, the circuit court found that defendant did not show a reasonable probability that she would have accepted the plea.

¶ 62     The court held a third-stage hearing regarding defendant's claim that her trial counsel was ineffective for failing to investigate alibi witnesses. At the conclusion of the hearing, the circuit

court denied defendant's request for a new trial. Defendant does not challenge the circuit court's decision relating to the issue presented at the third-stage evidentiary hearing.

¶ 63                                    ANALYSIS

¶ 64        Defendant contends that the circuit court erred in granting the State's motion to dismiss at the second stage of postconviction proceeding where she made a substantial showing of ineffective assistance of trial counsel.  Specifically, she alleges that her trial counsel was ineffective in (1) failing to investigate and call an eyewitness identification expert, and in (1) unilaterally rejecting a plea offer by the State. In turn, the State argues that the circuit court's decision to grant the State's motion to dismiss was proper where she did not establish a substantial showing that her trial counsel was ineffective. We affirm, in part, and reverse, in part, the circuit court's dismissal of defendant's postconviction petition at the second stage of postconviction proceedings.

¶ 65        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)) provides a method by which persons under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *People v. Hodges*, 234 Ill.2d 1, 9 (2009); *People v. Peeples*, 205 Ill.2d 480, 509 (2002). Here, the trial court reviewed defendant's postconviction petition at the second stage of postconviction proceedings. At this stage, counsel may be appointed to an indigent defendant (725 ILCS 5/122-4 (West 2008)), and the State, as respondent, enters the litigation (725 ILCS 5/122-5 (West 2008)). The circuit court must determine whether the petition and any accompanying documentation make "a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill.2d 239, 246 (2001), citing *People v. Coleman*, 183 Ill.2d 366, 381 (1998). At this stage, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true. *People v. Pendleton*, 223 Ill. 458, 473 (2006). The court reviews the petition's factual

sufficiency as well as its legal sufficiency considering the trial court record and appliable law. *People v. Ryburn*, 2019 IL App (4th) 170779, ¶ 22, citing *People v. Alberts*, 383 Ill.App.3d 374, 377 (4th Dist. 2008). If no such showing of a constitutional violation is made, the petition is dismissed. *Edwards*, 197 Ill.2d at 246. If, however, a substantial showing of a constitutional violation is set forth, the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. *Id*; 725 ILCS 5/122-6 (West 2008). We review *de novo* the circuit court's dismissal of a postconviction petition at the second stage. *Pendleton*, 223 Ill.2d at 473.

¶ 66 Defendant asserts that her trial counsel was ineffective. Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced the defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill.2d 142, 163 (2001). For the first prong, a defendant must overcome a strong presumption that, under the circumstances, the challenged action or inaction was sound trial strategy. *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 51. Decisions regarding which evidence to present and which witnesses to call are matters of trial strategy. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 38. "'Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance counsel be found.'" *People v. Peterson*, 2017 IL 120331, ¶ 80 (quoting *People v. Perry*, 224 Ill.2d 312, 355-56 (2007). To show sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 67                    Failure to Investigate and Call Eyewitness Identification Expert

¶ 68     Defendant contends that her trial counsel was ineffective for failing to investigate and call an eyewitness identification expert where such an expert "could have subverted the State's identification claim." In particular, defendant contends that an expert witness could have rebutted the State's efforts to "fuse" the Resendiz's description to defendant's appearance, rebutted the State's argument as to Resendiz's confidence in making her identification; and "frustrated the State's efforts to bolster Resendiz's viewing opportunity." Relying upon *People v. Hayes*, 2022 IL App (1st) 190881-B, defendant urges us to find that counsel's failures were objectively unreasonable, and she was prejudiced by the failure to present this testimony based upon the closeness of the evidence. Defendant further relies upon the trial court's questions and comments during the hearing on the State's motion to dismiss as well as in the written order to support the conclusion that the trial court erred in granting the State's motion to dismiss.

¶ 69     In turn, the State contends that the circuit court properly dismissed defendant's claim that trial counsel was ineffective. Specifically, the State responds that decisions on whether to investigate and call certain witnesses amounts to trial strategy and are immune from claims of ineffective assistance, and it would not have been reasonable for trial counsel to expect that such testimony would have been admissible where it was common practice in Illinois to deny such requests at the time of defendant's trial. The State also argued that defendant did not establish the prejudice prong of *Strickland*.

¶ 70     Initially, we consider the first prong of *Strickland*, i.e., whether defendant made a substantial showing that his trial counsel's performance fell below an objective standard of reasonableness. In doing so, we reject defendant's claim that his trial counsel was ineffective for failing to

investigate and present an eyewitness identification expert and find that he cannot overcome the presumption that it amounted to trial strategy.

¶ 71 In part, we follow the reasoning in *People v. Elliott*, 2022 IL App (1st) 192294, a case in which the defendant challenged, on direct appeal, his trial counsel's failure to investigate and call an expert witness on the reliability of eyewitness identification testimony. Regarding the claim that his trial counsel failed to investigate such an expert witness, the reviewing court found that, while "trial counsel has a professional duty to conduct reasonable investigations[,]" the defendant failed to "identify any portion of the record indicating that, in fact, trial counsel did not investigate the possibility of expert testimony." *Elliott*, 2022 IL App (1st) 192294, ¶ 38 (citing *People v. Domagala*, 2013 IL 113688, ¶ 38). The court found that the defendant "had the burden to overcome the strong presumption that counsel's decision not to present expert testimony was the result of trial strategy[,]" and the defendant could not overcome that presumption by requiring the court to presume that trial counsel did not conduct an investigation. *Id*.

¶ 72 Likewise, here, defendant cannot overcome the presumption that counsel's decision not to present expert testimony was a matter of trial strategy where defendant did not identify any portion of the record indicating that trial counsel did not investigate the possibility of expert testimony. The trial record, as well as defendant's petition, does not contain any such information. As such, we must treat counsel's decision not to present expert testimony as a matter of trial strategy and find that defendant cannot establish that his trial counsel's decision fell below an objective standard of reasonableness.

¶ 73 Nevertheless, even if we were to find that counsel failed to investigate the possibility of expert testimony, we cannot find that it was objectively unreasonable to forgo such an investigation and to call such an expert witness. To properly address defendant's claim, it is necessary to consider

the relevant caselaw relating to the evolution of the admission of eyewitness identification expert testimony. Here, we must look at the prevailing case law at the time of defendant's trial in 2010. See *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 38 ("Representation based on the law prevailing at the time of trial is adequate, and counsel is not incompetent for failing to correctly predict that the law will change."); See *People v. English*, 2013 IL 112890, ¶ 34 ("Appellate counsel's assessment of the merits of an issue, furthermore, depends on the state of the law at the time of direct appeal.")); *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

¶ 74    In *People v. Enis*, 139 Ill.2d 264 (1990), decided prior to defendant's trial, our supreme court recognized that other courts have held that expert testimony concerning eyewitness identification should be admissible in certain circumstances, but the court also expressed skepticism and caution against the overuse of such testimony. *Id.* at 286-287, 289; On retrial, our supreme court upheld its earlier decision and rejected the defendant's claim that his trial counsel was ineffective for failing to introduce the testimony of eyewitness identification expert at trial. *People v. Enis*, 194 Ill.2d 361 (2000).

¶ 75    Then, in 2012, two years after defendant's trial, the court provided an overview of the status of such claims in Illinois. *People v. McGhee*, 2012 IL App (1st) 093404. In *McGhee*, the defendant's postconviction claim of ineffective assistance of trial counsel for failing to present the expert testimony on reliability of eyewitness identification was dismissed at the second stage of postconviction proceedings. The petition included an affidavit from Doctor Geoffrey Loftus, presumably the same expert who provided an affidavit here. The reviewing court, after first

recognizing that "trial counsel has broad leeway in deciding whether to call a particular witness or to pursue a given strategy[,]" then found our supreme court and the appellate court has considered and rejected this same argument several times. *Id*. ¶ 54 (citing cases). Notably, the court found that "[w]e are unaware of, and defendant has not offered, any Illinois cases in which an attorney has been deemed ineffective for failing to offer, or a trial court has been found to have abused its discretion for refusing to allow, expert testimony on this subject." *Id*. (citing cases). Having also found that our supreme court has not definitively found that such testimony is inadmissible, the court in *McGhee* concluded that "it was not unreasonable for defense counsel to decline to present expert testimony regarding the reliability of eyewitness identification." *Id.*

¶ 76   In 2016, with our supreme court's decision in *People v. Lerma*, 2016 IL 118496, there was a shift in the way courts consider requests for the admission of expert testimony in eyewitness identification. In *Lerma*, our supreme court held that the trial court abused its discretion in denying defendant's request to allow expert testimony on the reliability of eyewitness identifications and that the error was not harmless under the facts of the case. *Lerma*, 2016 IL 118496, ¶ 25. However, in doing so, our supreme court looked at the prior history of the admissibility of this type of evidence and found that, "The last time this court addressed the admission of such testimony was in *Enis*, which was decided more than 25 years ago when the relevant research was in its relative infancy…[and] the exclusion of such testimony remains the common practice in Illinois to this day." *Lerma*, 2016 IL 118496, ¶ 24 (citing *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 55 (observing that "Illinois continues to reject, at least in practice, expert testimony on the reliability of eyewitnesses.").

¶ 77   Several cases have since discussed the impact that *Lerma* had on claims involving ineffective assistance of counsel for failing to call an eyewitness identification expert. Three of these cases

involved a claim of ineffective assistance of trial counsel for failing to call an eyewitness identification witness on review of the defendant's direct appeal. For instance, in *People v. Macklin*, 2019 IL App (1st) 161165, in finding that the defendant did not establish the ineffectiveness of his trial counsel, the majority noted that *Lerma* had not been decided at the time of the defendant's trial, and that, in *Lerma*, the court acknowledged that expert witnesses on the reliability of eyewitness testimony were being routinely excluded at the time of the defendant's trial. *Id.* ¶ 38. The majority also found that the issue in *Lerma* was "manifestly different" than the issue of ineffective assistance of trial counsel. *Id.* More recently, in *People v. Elliott*, 2022 IL App (1st) 192294, the court found that the defendant could not establish the ineffectiveness of his trial counsel by relying, in part, on its finding that "*Lerma* does not support the conclusion that trial counsel is necessarily ineffective for not presenting eyewitness expert testimony in any case…" and noted that *Lerma* "did not concern an ineffective assistance claim." *Elliott*, 2022 IL App (1st) 192294, ¶ 46; See also *People v. Sauseda*, 2018 IL App (1st) 151344-U, ¶ 57[1] (on review of the defendant's challenge on direct appeal, the court found that "[w]hile *Lerma* has changed the trend in Illinois regarding eyewitness identification, we cannot say that defense counsel's trial strategy to adhere to prevailing case law at the time of trial was deficient.").

¶ 78    In other cases, the courts have considered a claim of ineffective assistance of trial counsel on review of the summary dismissal of the defendant's postconviction petition as well as the denial of leave to file a successive petition. In *People v. Boone*, 2023 IL App (1st) 220433-U, ¶ 10,[2] in

---

[1] Even though this order was entered prior to January 1, 2021, this court may rely on the reasoning in a nonprecedential decision because nothing in the language of Illinois Supreme Court Rule 23(e) prevents a court from doing so. *People v. Ingram*, 2020 IL App (2d) 180343, ¶ 21, n. 1.

[2] Citing as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)(1) (eff. February 1, 2023) ("a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes.").

considering the first stage dismissal of the defendant's postconviction petition, the court found that the issue of ineffective assistance of trial counsel for failing to present the testimony of an eyewitness identification expert was an "entirely different question" than the question raised in *Lerma*. The court recognized that the decisions regarding what witnesses to call and what evidence to present at trial can amount to trial strategy and are "generally immune from claims of ineffective assistance of counsel." *Boone*, 2023 IL App (1st) 220433-U, ¶ 10. Ultimately, citing to *McGhee,* the court concluded that, because the law in Illinois precluded expert testimony on the reliability of eyewitness identification at the time of the defendant's trial, the defendant could not establish that there was an arguable basis for concluding that trial counsel rendered ineffective assistance. *Id*. ¶ 9; see also *People v. Burke*, 2021 IL App (1st) 200250-U, ¶ 34 (the summary dismissal of the defendant's postconviction petition affirmed where the defendant did not establish that his appellate counsel was ineffective for failing to challenge his conviction on the basis that his trial counsel failed to present testimony of an eyewitness identification expert where the defendant's trial occurred before *Lerma* was decided); *People v. Jaimes*, 2021 IL App (2d) 190241-U, ¶ 33 (in affirming the summary dismissal of the defendant's postconviction petition claim of ineffective assistance of trial counsel for failing to present an eyewitness identification expert, the court found that "[t]rial counsel was entitled to consider that expert testimony on eyewitness identification was routinely rejected."); *People v. Lawson*, 2020 IL App (1st) 161789-U, ¶ 21 (summary dismissal affirmed where there was no arguable basis for concluding that trial counsel's conduct fell below an objective standard of reasonableness "[i]n light of the law at the time of defendant's trial and the deference owed to trial counsel on matters of trial strategy…"); *People v. Young*, 2020 IL App (4th) 180456-U, ¶ 18 (the court rejected the defendant's claim of ineffective assistance in his successive postconviction petition when the defendant's trial took place in 2004 "when the

common practice was to deny requests to present an expert witness on eyewitness identification testimony."). In these cases, while some of the courts may have improperly relied upon the significance that the decision as to which witnesses to call amounts to trial strategy at the first stage of postconviction proceedings, the courts also recognized the fact that the defendant's trial occurred before *Lerma*, and distinguished *Lerma* on the basis that it did not concern a claim of ineffective assistance of counsel.

¶ 79 In the present case, based on the prevailing case law at the time of defendant's trial in 2010 – cautioning against the use of expert testimony on eyewitness identifications and recognizing that trial counsel has broad leeway in deciding whether to call a particular witness or to pursue a given strategy – trial counsel's failure to present such expert testimony did not fall below an objective standard of reasonableness. As in *McGhee*, defendant here does not point to any caselaw that was available at the time of his trial, in 2010, in which the courts had permitted the admission of expert identification testimony. In fact, the courts recognized the unavailability of this type of expert testimony around the time of defendant's trial. See *McGhee*, 2012 IL App (1st) 093404. Defendant cannot overcome the presumption that his trial counsel's decision as to which witnesses to present amounted to trial strategy.

¶ 80 Defendant, however, relies on *People v. Hayes*, 2022 IL App (1st) 190881-B, in which this court reversed the summary dismissal of a postconviction petition alleging that counsel was ineffective for failing to investigate or call an expert who, according to the defendant, could have opined on the weaknesses in the testimony of the State's eyewitnesses. *Id.* ¶¶ 2, 36-37. In reversing the summary dismissal of the defendant's postconviction petition, this court rejected the State's argument that counsel's decision to forgo an expert amounted to trial strategy, finding that "the burden to address a claim of trial strategy does not attach until the second stage of postconviction

proceedings" *Id.* ¶ 28 (citing *People v. Tate*, 2012 IL 112214, ¶ 22). This court also distinguished the State's reliance on *People v. Macklin*, 2019 IL App (1st) 161165, in which the court found that, because *Lerma* was decided after the defendant's trial, counsel could not have been ineffective for "failing to correctly predict that the law will change." *Id.* ¶ 34 (quoting *Macklin*, 2019 IL App (1st) 161165, ¶ 38). In distinguishing *Macklin*, this court looked at the fact *Macklin* was decided on direct appeal, where the court did not have the allegations in the postconviction petition to consider, and the defendant in *Hayes* alleged in his petition that his counsel knew about the law and science surrounding expert identification testimony at the time of his trial. This court expressed doubt that *Macklin's* analysis "will ever be much help when considering petitions" and noted that the State conceded in its brief that ample authority existed for the admission of this type of testimony at the time of the defendant's trial.

¶ 81    *Hayes* is distinguishable from the instant case on several bases. First, *Hayes* is distinguishable where it concerned a claim of ineffective assistance of counsel raised at the first stage of postconviction proceedings. This court found that it could not consider whether the defendant could overcome the presumption that trial court's decision amounted to trial strategy at the first stage of postconviction proceedings. Here, because defendant's challenge is made at the second stage of postconviction proceedings, defendant must make a substantial showing to overcome the presumption that this decision amounted to trial strategy and where such decisions will not ordinarily support a claim of ineffective assistance of counsel. Second, here, the State's brief does not contain any such concession that there was ample authority for the admission of this type of testimony at the time of defendant's trial, and, in fact, argues the exact opposite. Third, defendant's petition, as well as the other parts of the record, contain no allegation that his trial counsel knew about the law and science surrounding expert identification at the time of defendant's trial.

¶ 82    Defendant also points to comments made by the circuit court during the hearing on the State's motion to dismiss as well as the court's analysis in the written motion. However, as defendant also recognizes, we review *de novo* the second-stage dismissal of a defendant's postconviction petition. *People v. Dupree*, 2018 IL 122307, ¶ 29. Under a *de novo* standard of review, the reviewing court owes no deference to the trial court's judgment or reasoning. *People v. Jones*, 2021 IL App (1st) 182392, ¶ 39 (citing *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 68). *De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *People v. Young*, 2022 IL App (1st) 210534, ¶ 41(citing *People v. Van Dyke*, 2020 IL App (1st) 191384, ¶ 41). Consequently, after concluding this *de novo* review, we not persuaded by any of defendant's additional arguments.

¶ 83    Because we find that defendant did not make a substantial showing that her counsel's performance fell below a reasonable standard, we need not consider defendant's claim relating to the prejudice prong of *Strickland*. *People v. Johnson*, 2021 IL 126291, ¶ 53 (citing *Strickland*, 466 U.S. at 700). Because a defendant must satisfy both prongs of the *Strickland* test to prevail, a court may dismiss the claim if either prong is missing. *People v. Flores*, 153 Ill.2d 264, (1992). In sum, we affirm the circuit court's decision to grant the State's motion to dismiss where defendant did not establish that her trial counsel's performance fell below an objective standard of reasonableness for failing to investigate and call an eyewitness identification expert.

¶ 84                    <u>Unilateral Rejection of Plea Offer by Trial Counsel</u>

¶ 85    Defendant also alleges that her attorney rendered ineffective assistance by advising her of a plea offer by the State but then unilaterally rejecting that offer. She contends that her counsel informed her about the plea offer, but then informed her that he had rejected it before she informed him that she wanted to accept the offer. The State, in turn, responds that defendant failed to make

a substantial showing where the trial record positively rebuts the defendant's claim that she received a plea offer by the State, that she would have accepted the alleged plea agreement offer in lieu of proceeding to trial, and there is no evidence that the trial court would have accepted the plea.

¶ 86    A defendant has a constitutional right to the effective assistance of counsel in plea negotiations with the State. *People v. Hale*, 2013 IL 113140, ¶ 16. "This right to effective assistance of counsel extends to the decision to reject a plea offer, even if the defendant subsequently receives a fair trial." *Hale*, 2013 IL 113140, ¶ 16 (citing *People v. Curry*, 178 Ill.2d 509, 518 (1997)). The decision as to whether to accept or reject a plea offer, however, is one that only defendant can make." *People v. Blommaert*, 237 Ill.App.3d 811, 816, (1992).

¶ 87    We apply the *Strickland* standard to such claims. *Hale*, 2013 IL 113140, ¶ 15. To satisfy the second prong of *Strickland*, a defendant must not only "establish that there is a reasonable probability that, absent his attorney's deficient advice, he would have accepted the plea offer," he "must also demonstrate a reasonable probability that the plea would have been entered without the prosecution cancelling it or the trial court refusing to accept it." *Id.* ¶¶ 18-19 (quoting *Missouri v. Frye*, 566 U.S. 134, 147 (2012)). Moreover, "'the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.'" *People v. Walker*, 2018 IL App (1st) 160509, ¶ 31 (quoting *Missouri v. Frye*, 566 U.S. 134, 147 (2012)). That showing must rely on independent objective confirmation that defendant's rejection of the proffered plea was based upon counsel's erroneous advice," rather than other considerations. *Id.* ¶ 18. (quoting *People v. Curry*, 178 Ill.2d 509, 532 (1997)). If a defendant does not show he or she would have accepted the State's plea offer but for counsel's deficient performance, then he or she cannot demonstrate prejudice and no need exists to address additional factors. *Id.* ¶ 21.

¶ 88     It bears repeating that the circuit court was to take all well-pleaded facts not positively rebutted by the record as true, and that claims related to matters outside the trial record should generally not be resolved on the pleadings. *People v. Snow*, 2012 IL App (4th) 110415, ¶ 15.

¶ 89     In this case, the trial record contains virtually no discussion of the plea bargaining and certainly nothing to positively rebut defendant's allegation that her attorney unilaterally rejected the State's plea offer. While the State relies upon defendant's continued silence regarding the existence of a plea offer throughout the pre-trial proceedings and even after her trial counsel withdrew the alibi defense, we cannot say that this sufficiently rebuts defendant's allegation that an offer was made or defendant's allegation that she would have accepted the offered plea but for her reliance upon her attorney's statement. In other words, we cannot say that "no factfinder could ever accept the truth" of the allegation that the defendant received a plea offer or that he or she would have accepted the offer. *People v. McGee*, 2021 IL App (2d) 190040, ¶ 38 (citing *People v. Robinson*, 2020 IL 123849, ¶ 60; *People v. Simms*, 2021 IL App (1st) 161067-B, ¶ 28). "Contradictions between the defendant's averments and the trial evidence are not enough, because recognizing the existence of a conflict with the trial evidence is not the same as finding that the averments are positively rebutted." *McGee*, 2021 IL App (2d) 190040, ¶ 38 (citing *Robinson*, 2020 IL 123849, ¶ 60; *Simms*, 2021 IL App (1st) 161067-B, ¶ 35). Here, the absence of any discussion regarding the plea offer in the record is certainly understandable where a trial record is typically silent "as to what a defendant was told about rejecting or accepting a guilty-plea offer from the State." *People v. Williams*, 2016 IL App (4th) 140502, ¶ 33.

¶ 90     For instance, in *Williams*, the court reversed a trial court's second-stage dismissal upon a finding that the postconviction petition alleged a substantial showing of a constitutional violation. The defendant, who had rejected the State's 18-year plea offer and proceeded to trial, where he

was later found guilty and sentenced to 45 years' imprisonment, alleged in his postconviction petition that his counsel was ineffective for failing to inform him about the appropriate sentencing range. *Id.* ¶ 6. He further alleged that his counsel's advice led him to reject the State's plea offer, and that he would have accepted that offer if he had known the information that counsel failed to tell him. *Id.*

¶ 91        Pertinent to the issue raised here, in *Williams*, the court found that the allegations of the petition were uncontradicted by the record and therefore must be taken as true, as the trial court had not conducted a pretrial inquiry to make a record of any guilty-plea negotiations. *Id.* ¶ 44. In doing so, the court recognized that postconviction challenges relating to claims of ineffective assistance of trial court in conducting plea negotiations with the State "are almost always based on matters that occur *de hors* the record." *Id.*

¶ 92        Likewise, here, in the absence of any mention in the trial record as to what occurred relating to the alleged plea offer by the State, we find that it is necessary to advance the postconviction petition to the third stage of postconviction proceedings for an evidentiary hearing.

¶ 93        The State, however, argues that defendant relied upon self-serving and uncorroborated affidavits from herself and her mother, and therefore, did not sufficiently allege facts to objectively corroborate that she would have accepted the plea offer absent counsel's deficient performance. Specifically, the State argues that we should look to the absence of an affidavit from trial counsel to corroborate defendant's claim. However, we have already recognized that at the second stage of postconviction proceedings, it is unrealistic to expect a defendant to procure an affidavit from counsel that addresses the substance of an ineffective assistance claim. *People v. Moore*, 2022 IL App (1st) 192290, ¶ 26 (quoting *People v. Collins*, 202 Ill.2d 59, 68 (2002)). Moreover, defendant's claim is corroborated by the affidavit of defendant's mother, Eva Adamez. Adamez's

affidavit corroborates the existence of a plea offer by the State and the defendant's desire to accept the plea offer. The State's argument amounts to a request for us to make a credibility determination, and it is well-established that credibility is not an issue at the second stage of postconviction proceedings. *People v. Sanders*, 2016 IL 118123, ¶ 42.

¶ 94     In addition, "[t]he disparity between the sentence a defendant faced and a significantly shorter plea offer can be considered supportive of a defendant's claim of prejudice." *Hale*, 2013 IL 113140, ¶ 18. Defendant faced a combined sentence of 67 years' imprisonment. The sentencing range for intentional homicide of an unborn child is "the same as for first degree murder[,]" which is 20 to 60 years' imprisonment. 720 ILCS 5/9-1.2(d)(eff. Jan. 1, 2000); 730 ILCS 5/5-4.5-20(a). The sentencing range for robbery, a Class 2 offense, is three to seven years' imprisonment. 720 ILCS 5/18-1(c); 730 ILCS 5/5-4.5-35(a) (Class 2 sentencing range). According to defendant's petition, the State offered to allow her to plead guilty to 20 years' imprisonment; the statutory minimum for first degree murder. Therefore, defendant alleged a significantly shorter time of imprisonment as far as the plea offer. Defendant has also made a substantial showing here because defendant's 23-year sentence is more than the State's alleged offer of 20 years' imprisonment. Moreover, there is nothing in the rejected plea offer that reveals that it would have been cancelled by the State or rejected by the court. Therefore, we reverse the trial court's judgment

¶ 95                    State's Motion to Dismiss on Untimeliness Grounds

¶ 96     In light of our decision to remand for a third-stage evidentiary relating to defendant's claim that his trial counsel was ineffective for unilaterally rejecting the State's alleged plea offer, we consider the State's request that on remand we instruct the circuit court to determine the credibility of defendant's affidavit claiming that her untimely petition was not the result of her culpable negligence. Section 122-1(c) of the Act provides, in relevant part, "No proceedings under this

Article shall be commenced more than ***3 years from the date of conviction ***, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence." 725 ILCS 5/122-1(c) (West 2008).

¶ 97    The State points out that, while the circuit court delayed its resolution of the timeliness issue until the evidentiary hearing, on the basis that it "may involve questions of fact[,]" when the circuit court held the hearing, the circuit court did not make any finding regarding this issue in its written order denying defendant's petition. In turn, defendant acknowledges that she filed an untimely petition, however, she argues that the State forfeited this issue by failing to raise it during the initial evidentiary hearing.

¶ 98    In this case, defendant's original petition for postconviction relief was filed more than three years after her conviction, and the State raised the statute-of-limitations defense in their motion to dismiss. Then, in defendant's responsive motion, she argued that he was not culpable negligent because she relied upon the erroneous advice of his appellate counsel.

¶ 99     In the circuit court's written order at the second stage of postconviction proceedings, the circuit court agreed with the State's argument that defendant did not file her postconviction petition within the statutory time limitations. The court further acknowledged that defendant had contended that she was not culpably negligent for the delay because she relied upon the incorrect advice of her appellate counsel. Then, citing to *People v. Rissley*, 206 Ill.2d 403, 421-22 (2003) the circuit court concluded that "[g]ood-faith reliance on appellate counsel's erroneous advice can render a *pro se* petitioner not culpably negligent for a late filing." While the circuit court concluded that defendant had stated a "legally cognizable basis for her late filing[,] the court also found "whether a late filing is due to a petitioner's culpable negligence may involve questions of fact." Thus, the

court found that defendant "was entitled to present evidence on this issue in an evidentiary hearing should her substantive claims merit one. The Court need not resolve this issue at this time."

¶ 100      While the circuit court found that defendant presented a legally cognizable basis for her late filing, it declined to resolve the issue at the second stage on the basis that defendant's request for a finding of a lack of culpable negligence may have involved a question of fact. Citing to *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 27, the circuit court provided defendant the opportunity to present evidence at the evidentiary hearing on this issue.

¶ 101      Thus, the circuit court relied upon this analysis in *Upshaw* to support its decision that it need not decide the issue of the timeliness of defendant's postconviction petition at the second stage of postconviction proceedings and that this issue could be resolved at an evidentiary hearing. However, *Upshaw* does not provide the circuit court with grounds to delay ruling on a timeliness issue at the second stage of postconviction proceedings.

¶ 102       In *Upshaw*, the defendant challenged the trial court's determination, at the second stage, that the defendant failed to make a substantial showing of a lack of culpable negligence. *Id*. ¶¶ 23-26. After this court found that it must accept the defendant's allegations as true at the second stage, this court also found that defendant had made a substantial showing that the delay in filing his postconviction petition was not due to his culpable negligence. *Id*. ¶ 27. In remanding the defendant's petition for an evidentiary hearing, the court also found that "the State will have the opportunity at an evidentiary hearing to rebut those facts…" *Id*. Thus, in *Upshaw*, this court never held that a circuit court need not resolve the issue of timeliness at the second stage of postconviction proceedings; instead, it only acknowledged that the State may rebut such a claim at the third stage proceedings. Therefore, the circuit court erred in relying on *Upshaw* to support its decision to delay its decision regarding the timeliness issue until the evidentiary hearing.

¶ 103    In the briefs, neither party discusses the trial court's decision to delay ruling on the State's assertion of the affirmative defense of untimeliness to the third stage of postconviction proceedings. See *People v. Boclair*, 202 Ill.2d 89, 101 (2002) ("…time limitations in the Act should be considered as an affirmative defense and can be raised, waived, or forfeited, by the State."). However, we find that the circuit court erred in delaying its determination as to the timeliness of defendant's petition at the second stage of postconviction proceedings. Pursuant to the Act, the trial court must dismiss a petition as untimely at the second stage upon the State's motion to dismiss on timeliness grounds unless the defendant can overcome the time bar by alleging a lack of culpable negligence, or unless the defendant is able to obtain the State's waiver or forfeiture of the untimeliness defense. *People v. Perkins*, 229 Ill.2d 34, 43 (2007) (citing 725 ILCS 5/122-1(c) (West 2002)). We do not find any caselaw allowing the circuit court to delay its ruling until the third stage of postconviction proceedings as to whether the State has shown that a defendant filed an untimely petition and whether a defendant has made a substantial showing of a lack of culpable negligence.

¶ 104    Nevertheless, this issue of timeliness was asserted by the State in its motion to dismiss, but the State did not request any further review by the circuit court at the subsequent postconviction proceedings. In particular, the State never asked for the circuit court review its decision to delay ruling on the timeliness issue until the third stage of postconviction proceedings, never asked the circuit court to make a determination as to the timeliness of defendant's petition, and never asked to present any evidence at the evidentiary hearing to rebut the defendant's claim of a lack of culpable negligence.

¶ 105     While defendant asks us to find that the State forfeited this timeliness issue, we decline to do so. Generally, issues not raised in the circuit court are forfeited. See *People v. Smith*, 2021 IL App (1st) 200984, ¶ 15. Here, the State raised the issue at the trial level.

¶ 106     Instead, we find that the State abandoned its previously filed motion to dismiss on timeliness grounds. "A party filing a motion has the responsibility 'to request that the trial court rule on it, and when no ruling has been made on a motion, the motion is presumed to have been abandoned absent circumstances indicating otherwise.'" *People v. Haywood*, 2016 IL App (1st) 133201, ¶ 25 (quoting *Rodriguez v. Illinois Prisoner Review Board*, 376 Ill.App.3d 429, 433 (5th Dist. 2007)); see also *People v. Johnson*, 159 Ill.2d 97, 123 (1994) (our supreme court found that defendant's failure to pursue his motion for substitution of judge in the four months from the time he filed it to the beginning of his trial, without good reason, constituted abandonment of the motion). Here, the State never asked for the circuit court to rule on its argument that defendant's petition was filed outside the statutory time limitations after the circuit court delayed its ruling to the third stage of postconviction proceedings. As such, finding that the State abandoned its motion on timeliness grounds, we decline the State's request to instruct the circuit court to determine the credibility of defendant's affidavit claiming that her untimely petition was not the result of her culpable negligence.

¶ 107                                    CONCLUSION

¶ 108     In summary, we affirm the judgment of the circuit court's decision to grant the State's motion to dismiss regarding defendant's contention that her trial counsel rendered ineffective assistance by failing to investigate and call an eyewitness identification expert. However, we reverse the judgement of the circuit court's decision to grant the State's motion to dismiss regarding defendant's contention that her trial counsel rendered ineffective assistance for unilaterally

rejecting the State's allege plea offer. Accordingly, we remand to the circuit court to hold an evidentiary hearing solely to resolve this one claim only.

¶ 109 For the foregoing reasons, the judgment of the circuit court is affirmed in part and reversed in part; cause remanded.

¶ 110 Affirmed in part and reversed in part, cause remanded.